Daniel M. Baczynski, Bar No. 15530
Baczynski Law, PLLC
12339 S. 800 E., Ste 101
Draper, UT 84020
Phone: (708) 715-2234
*dan@bskilaw.com*

---

## UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

---

| | |
|---|---|
| Damon Crist, | **FIRST AMENDED COMPLAINT** |
| Individually and on behalf of a class, | |
| vs. | Case No:  2:21-cv-00445-JNP-DBP |
| Department of Corrections, Brian Nelson, Matt Coombs, Sgt. James Waters, Sgt. Labounty, Tony Washington, Dr. Darrel Olsen, Dr. Gabriel Powers, Dr.. Edmon Nowicki, P.A. Maria Campbell, Wesley Shuman, Medical Technician Jordan, JOHN DOES 1-10, | Judge:   Jill. N. Parrish |
| | Magistrate Judge: Dustin B. Pead |
| Defendants. | |

Plaintiff Damon Crist (Crist), by and through his attorney, and for his First Amended

Complaint against Defendants and John Does alleges as follows:

### <u>INTRODUCTION</u> – SCANNER CASE

This case involves the DOC and its employees' failure to abide by basic safety

precautions regarding radiation exposure. The DOC uses scanners on incarcerated inmates when

they leave and reenter the prison to prevent the entry of contraband. These machines, like the

scanners used at airports, emit some radiation. But while the dose per scan is relatively small,

1

radiation is cumulative. And where inmates are subjected to multiple scans a day the cumulative dose quickly exceeds annual state radiation safety limits - putting inmates at risk for adverse health outcomes.

Recognizing the risk for cumulative radiation, the scanners themselves come with safeguards in place to monitor each inmates' annual radiation exposure. Prior to each scan, the machine requires an "offender number" for the inmate to be scanned. The machine records each scan and maintains a log of the yearly dose received by each inmate. Once the yearly amount has been reached, the machine will refuse to scan the inmate until the inmate is once again under the annual limit.

The DOC, however, refuses to abide by the safeguard. If the machine refuses to scan the inmate because the annual limit has been reached, the DOC simply rescans the inmate under a testing code rather than the inmate's offender number. The testing code is not linked to any inmate's radiation log, therefore the testing code allows DOC to scan inmates regardless of their cumulative exposure to radiation. Its practice routinely exposes inmates to radiation that exceeds annual safety limits set by Utah's Division of Waste Management and Radiation Control and puts inmates at risk for long term complications such as increased risks for cancer. This practice must be enjoined, with inmates compensated for their unnecessary exposure to radiation.

## JURISDICTION AND VENUE

1. This Court has jurisdiction over ~~all~~ the matter ~~civil matters occurring in the State of Utah pursuant to Utah Code § 78A-5-102(1)~~under federal question jursidiction.

2. Venue is proper because the cause of action arose in Salt Lake County, State of Utah.

2

3. Defendants are subject to personal jurisdiction within the State of Utah.


**<u>PARTIES</u>**

4. Damon Crist is and at all times pertinent has been a citizen of the United States and a resident of the State of Utah.

5. Defendant is Brian Nelson, in his individual capacity, who is the Executive Director at the Utah Department of Corrections (DOC) and is responsible for providing adequate training and screening procedures for inmates at Draper Correctional Facility (DCF).

6. The Department of Corrections (DOC) is a political subdivision of the State of Utah. As part of its corporate powers, and at all times relevant, the Department of Corrections maintained the DCF.

7. Defendant is Matt Coombs, in his individual capacity, who is a lieutenant at the DCF. At all times relevant, Matt Coombs was responsible for supervising sergeants stationed at the Wasatch Housing Unit.

8. Defendant is Sergeant Waters, in his individual capacity, who is an employee of DOC.

9. Defendant is Sergeant Labounty, in his individual capacity, who is an employee of DOC.

10. Defendants John Does are staff and supervisors at the DCF who were responsible for training, supervising, or correctly operating scanning machines used at DCF for screening inmates leaving and entering the facility for contraband.

11. Defendants (excluding the Department of Corrections) are persons under the meaning of 42 U.S.C. § 1983 and are located in this judicial district.

## GENERAL ALLEGATIONS

### Offender Numbers

12. Crist is an inmate stationed at the Draper Correctional Facility (DCF).

13. All prisoners who entered the DOC system are issued a unique numerical identifier called an "offender number".

14. Crist was issued an "offender number" of 154706.

15. The DOC issues "offender numbers" to keep track of inmates.

16. DOC issues "offender numbers" to identify inmates and eliminate errors among prisoners with common names.

17. Once an "offender number" is issued to an inmate, that offender number does not change.

18. If an inmate is released from custody and then later incarcerated, the inmate will be issued his prior "offender number".

19. DOC trains its staff extensively regarding the appropriate use of "offender numbers".

20. DOC trains its staff that it is never appropriate to intentionally use or input a different number than the one assigned for each respective inmate.

### Radiation Generally

21. Radiation is the emission or transmission of energy.

22. Radiation with sufficiently high energy can ionize atoms (knock electrons off atoms) creating ions. Ionization occurs when an electron is stripped (or "knocked out") from an electron shell of the atom, which leaves the atom with a net positive charge.

23. Because living cells and, more importantly, the DNA in those cells can be damaged by this ionization, exposure to ionizing radiation is considered to increase the risk of cancer.

24. Prolonged exposure even to low doses of radiation increases the risk for adverse health outcomes, including hypertension, heart attacks, strokes, and cancer.

25. For this reason, the guiding principle of radiation safety is "ALARA": "as low as reasonably achievable". This principle means that you should avoid even small doses of radiation if the dose has no direct benefit.

## Soter RS Contraband Scanners

26. DOC used Soter RS Scanners to screen inmates for contraband.

27. The Soter Scanner is a head-to-toe full body scanner.

28. The Soter Scanner uses x-rays to produce internal images of scanned inmates.

29. When producing internal images, the Soter Scanner exposes inmates to up to 2.5 Microsieverts of radiation.

30. The National Council of Radiation Protection and Measurements recommends annual exposure of no more than .25 Millisieverts (from security screening procedures with X-Ray screening devices.

31. One Millisiervert is equal to 1,000 Microsierverts.

5

32. At a rate of 2.5 Microsieverts per scan, an inmate would reach his annual limit for X-Ray screening devices after 100 scans.

33. Utah prohibits subjecting members of the public to more than 1 Millisiervets of radiation from medical procedures.

34. Setting aside that a security screening does not provide an inmate with the same benefits as a medical procedure, inmates would reach the annual limit set for medical radiation after 400 scans (at a rate of 2.5 microsieverts per scan).

35. To administer these annual limits, the National Council of Radiation Protection and Measurements requires protocol be put in place to monitor radiation exposure.

36. To comply with the National Council of Radiation Protection and Measurements' guidance on radiation exposure, the Soter Scanner logs each inmate's annual radiation exposure.

37. Prior to a scan, a prison officer must input the inmate's offender number.

38. The Soter Scanner uses the offender number to record scanning data and register each inmate's cumulative dose of radiation through a central database.

39. If an inmate exceeds the annual limits on radiation exposure, the Soter Scanner will still act as though a scan is being administered but will not subject the inmate to X-Rays.

40. In other words, the Soter Scanner will not scan inmates once he has reached an unsafe level of radiation exposure for the year.

41. The Soter Scanner resumes scanning the inmate after cumulative radiation exposure falls back under annual limits.

**The Department of Corrections refuses to abide by the Soter Scanners safety protocols and subjects inmates to unsafe levels of annual radiation**

42. Defendants subject inmates who leave housing units for work to X-Ray scans in the Soter Scanners each time they leave and re-enter the housing unit.

43. Over the past year, Crist has been subjected to Soter scans as often as 4 times a day, Monday through Thursday, for a total of 16 scan a week.

44. At this rate, Crist would have been subjected to over 800 scans in a year.

45. At 800 scans a year, Crist would significantly exceed both the National Council of Radiation Protection and Measurements' annual limit on Soter scanner radiation and Utah's annual limit on medical radiation exposure.

46. At some point during the past year, the Soter Scanner determined Plaintiff had met the annual limit for radiation and would no longer subject Plaintiff to additional Soter scans.

47. Rather than abide by Soter Scanners safeguards, Defendants elected to subject inmates to radiation in excess of the annual limits at risk to the inmates' own health and safety.

48. Normally, inmates to be scanned would provide the screening officers with his offender number, enter the machine (similar to an airport scanner), await the scan, and then exit the scanner.

49. Around April 2020, however, Sgt. Labounty and other Lonepeak officers added a new step in the usual scanning process.

50. Multiple times a week, and at times daily, Sgt. Labounty and other Lonepeak officers would refuse to allow Plaintiff and other inmates from exiting the scanner after a scan. Instead, the officers would inform Plaintiff the scanner did not scan and would request the offender number again.

51. On information and belief, the scanner did not scan because Plaintiff had already been exposed to the annual limit for radiation exposure.

52. During the second scan, officers would evade the safety protocols on the Soter Scanner by using a random offender numbers or using a "training code".

53. The Scanner, believing the inmate to no longer be at risk for overexposure, would then scan the inmate like normal.

54. Following a bout of COVID, Plaintiff was transferred from Lonepeak housing to Wasatch housing unit.

55. Sgt James Waters controlled the scanners at the Wasatch facility.

56. Similar to his experience in Lonepeak, Plaintiff was exposed to multiple scans a day.

57. Through this policy and practice, inmates were routinely exposed to radiation in excess of annual limits thereby needlessly increasing their long-term risks for cancer, hypertension, heart attack, stroke, and other medical complications.

58. Moreover, because Defendants committed scans under different offender numbers or "training codes", inmates are left with no records as to how much radiation each inmate was exposed to per year.

59. Plaintiff has filed grievance over the scanning practices but the grievances have been ignored.

60. Instead, Department of Correction's administration, including Sgt. Waters, posted a sign on the scanners that if the machine refuses to produce a new scan to use the "training code" instead of the offender number to produce a good scan.

61. The Soter Scanner's "training code" was never intended to be used to bypass the scanner's safety protocols.

62. Plaintiff and other inmates continue to be subjected to radiation above annual safety standards.

63. Plaintiff and other inmates have suffered and will continue to suffer from exposure to unsafe radiation until Defendants are required to abide by the safety protocols included in the Soter Scanners, including properly documenting and recording each inmate's cumulative exposure to radiation and declining to scan inmates once they have exceeded annual limits.

## FIRST CAUSE OF ACTION

**Violation of Crist's 8th Amendment Right to be Free of Cruel and Unusual Punishment**
against Brian Nelson, Matt Coombs, Sgt. James Waters, Sgt. Labounty
(Cognizable under 42 U.S.C. §1983)
*Individually and on behalf of a Class*

63. Plaintiff adopts by reference all preceding paragraphs.

64. "After incarceration," the Eight Amendment prohibits "the unnecessary and wanton infliction of pain" on prisoners. *Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986).

9

65. Prison officers, including Defendants, were trained on the Soter Scanning device.

66. During the training, Defendants were instructed regarding radiation and the importance of logging offender numbers so that a radiation log for each inmate is maintained.

67. Despite the training, the DCF has instilled a practice or policy by which inmates are routinely subjected to radiation above annual safety limits.

68. Though other methods of examining inmates for contraband exist, officers continue to scan inmates who have reached annual limits for radiation exposure with reckless disregard for the risks associated with prolonged exposure.

69. Brian Nelson, as the executive director for the Department of Corrections, is responsible for maintaining constitutionally compliant screening procedures.

70. Instead, Brian Nelson has implemented policies and procedures which put inmates in needless risk from radiation exposure.

71. Even after Crist wrote Brian Nelson a letter regarding the Soter Scanning devices, Brian Nelson refused to enact any changes to screening procedures.

72. His failure to remedy an unconstitutional practice represents inherent consent and approval of this practice.

73. Moreover, Lt. Coombs, Sgt. James Waters, and Sgt. Labounty all acted to propagate a policy and practice which was not constitutional.

74. Despite objections by his officers, Sgt. Waters ordered his subordinates to screen inmates after they reached their annual radiation exposure limit.

75. Sgt. Labounty similarly ordered his subordinates to disregard their training and scan inmates even after they reached their annual exposure limit.

76. Lt. Coombs met with Plaintiff after Plaintiff filed his grievance. Lt. Coombs was threatening and dismissive of Plaintiff's claims.

77. He told Plaintiff "I will not be making changes to my scan program because you don't like them".

78. He also threatened to take away Plaintiff's job if he continued making grievances.

79. Defendants' screening practices have put Crist at unnecessary risk for complications deriving from radiation exposure.

80. The Soter Scanner was not intended to be the sole means by which officers screen inmates for contraband.

81. The Soter Scanner was intended as a supplemental device and was not created to be used multiple times a day on inmates.

82. Defendants have less dangerous means of screening contraband and have elected not to pursue those means in favor of exposing inmates to unnecessary radiation.

**<u>SECOND CAUSE OF ACTION</u>**
**Deprivation of Rights under Article I, Section 9 of the Utah Constitution**
**Unnecessary Rigor in Confinement**
against Brian Nelson, Matt Coombs, Sgt. James Waters, Sgt. Labounty,
Department of Corrections
*Individually and on behalf of a Class*

83. Plaintiff adopts by reference all preceding paragraphs.

84. The Department of Corrections is responsible for the constitutional violations committed by its officers under DOC policy.

11

85. Defendants' acts and omissions as set forth above deprived Mr. Crist of his constitutional rights guaranteed by Article I, Section 9 of the Utah Constitution, which provides that imprisoned persons shall not be subjected to or treated with unnecessary rigor.

86. Defendants and John Does' violations of Mr. Crist's rights secured under Article I, Section 9 proximately caused Mr. Crist to suffer damages, including but not limited to an increased risk for negative health outcomes deriving from radiation exposure and sever mental anguish stress caused by exposed to X-Rays several times a day without any attempts by Defendants to limit the risks associated with their screening procedures.

87. Defendants were on notice that increased radiation can cause suffering and negative health outcomes from the training they received about the Soter Scanners.

88. Despite being on notice, Defendants have taken no steps to limit inmate exposure to unnecessary scans.

89. There was no reasonable justification for Defendants continued use of X-Ray scanners once inmates reached the annual safety limits.

90. Defendants foresaw, or should have foreseen, the possibility of inmates suffering negative health outcomes from radiation exposure.

### THIRD CAUSE OF ACTION
**Negligence**
against Brian Nelson, Matt Coombs, Sgt. James Waters,
Sgt. Labounty, and Department of Corrections
*Individually and on behalf of a Class*

91. Plaintiff adopts by reference all preceding paragraphs.

92. The Department of Corrections is responsible for the conduct committed by its staff.

12

93. Defendants had a duty of care to Plaintiff.

94. That duty of care required limiting radiation exposure, documenting radiation exposure, and shielding Plaintiff from additional purposeful radiation exposure when he reached his annual cumulative exposure.

95. Defendants violated their duty of care by requiring Crist to be scanned multiple times a day, refusing to properly document Crist's radiation exposure, and purposefully scanning Crist after he reached his annual limit.

96. By breaching their duty, Defendants have put Crist at risk for negative health outcomes due to prolonged exposure to radiation.

<u>**FOURTH CAUSE OF ACTION**</u>
**Intentional Infliction of Emotional Distress**
against Brian Nelson, Matt Coombs, Sgt. James Waters,
Sgt. Labounty, and Department of Corrections
*Individually*

97. Plaintiff adopts by reference all preceding paragraphs.

98. When Plaintiff was originally explained why he was being scanned a second time, Plaintiff had no concept as to how much radiation was produced by the Soter Scanners.

99. Plaintiff became very stressed and anxious because he was suffering (and still suffers) from lesions on his hands which have been very slow to heal.

100. He did not know whether to blame his COVID recovery and the radiation for his reduced healing ability.

101. Accordingly, Plaintiff was very purposeful in seeking swift changes to the screening practices.

102. Plaintiff's grievances were repeatedly ignored.

103. When Plaintiff discussed the scanners with officers, officers voiced their discomfort with the practice but reiterated they were ordered to scan everyone.

104. When Plaintiff discussed the scanners with supervisors, lieutenants and sergeants told Plaintiff they would subject him to as many scans as they wanted.

105. They also told Plaintiff they would use whatever code they wanted to log radiation exposure.

106. Plaintiff legitimately believed he would suffer radiation poisoning.

107. This belief lasted for months until he learned the radiation was relatively low in dose and therefore was unlikely to cause acute symptoms.

108. Still, Plaintiff has suffered extreme stress due to Defendants' screening practices and their failure to address Plaintiff's concerns.

## CLASS ALLEGATIONS

109. Plaintiff brings his claims on behalf of a class pursuant to Rule of Civil Procedure 23(a) and 23(b)(3).

110. The Class consists of (a) all detainees residing at the DCF (b) against whom DOC and its employees (c) routinely subject to scans through the Soter Scanners (d) between June 23, 2017, and the present.

111. On information and belief, the class is so numerous that joinder of all members in not practicable. The information relating to the precise number of persons who fall within the respective classes is within the control of the Defendant.

112. There are questions of law and fact common to the members of each class, which common questions predominate over any questions relating to individual class members. The predominant common questions are (a) whether Defendants have propagated a policy or practice whereby radiation exposure is not properly logged by the Soter Scanner; (b) whether this practice puts detainees at risk for radiation exposure in excess of annual safety limits; (c) whether such a practice violates detainee's state and federal constitutional rights; and (d) whether this screening practice should be enjoined.

113. Plaintiff's claims are typical of the claims of the respective class members. All are based on the same factual and legal theories.

114. Plaintiff will fairly and adequately represent the members of each class. Plaintiffs has retained counsel experienced in class actions and civil rights litigation.

115. A declaration of law and injunctive relief is appropriate for the members of the Class.

116. A class action is superior for the fair and efficient adjudication of the claims of the Classes, in that:

    a. Individual actions are not economically feasible;

    b. Members of the class are likely to be unaware of their rights;

    c. Congress intended class actions to be an enforcement mechanism for constitutional violations.

## <u>PRAYER FOR RELIEF – SCANNER CASE</u>

WHEREFORE, Plaintiff requests this court enter judgment against Defendants, and each of them and provide the following relief:

a. Certify the Class and appoint Plaintiff as the class representative and his counsel as class counsel;

b. Compensatory and special damages in whatever amount, exclusive of costs and interest, that Plaintiff/the Class is found to be entitled;

c. Punitive/exemplary damages against Defendants in whatever amount, exclusive of costs and interest, that Plaintiff/the Class is found to be entitled;

d. For interest and costs as allowed by law;

e. For attorney fees, pursuant to 42 U.S.C. § 1988;

f. For declaratory and injunctive relief requiring Defendant to properly log "offender numbers" into the scanner so as to preserve a proper radiation log and prohibiting Defendants from scanning inmates who have reached their annual safety levels for radiation exposure; and

g. Such other and further relief as the court deems appropriate.

INTRODUCTION – COVID TREATMENT

The Draper Correctional Facility (DCF) was fortunate to avoid any outbreak of COVID-19 prior to September 2020. However, once the pandemic breached the prison's walls, the Department of Corrections (DOC) and medical staff mismanaged all aspects of their response. This resulted in a super spreader event that infected thousands and resulted in 18 deaths.

DOC and its staff needlessly put inmates at risk through needless transfer of infected inmates throughout the prison, the failure to follow basic safety procedures like changing gloves

16

between testing, and failing to move infected inmates from general population in a timely manner upon a positive test.

Once inmates tested positive, DOC transferred the inmates to isolation until diseases was no longer transmissible– proper protocol. The conditions present in isolation, however, were severely lacking. Inmates were housed by the hundreds without access to medical personnel. No care was provided to inmates to ease the symptoms of COVID. While inmates were occasionally dispensed Tylenol, the prison frequently ran out leaving inmates without even the mildest form of pain relief. The inmates were given thermometers to test each other's temperatures for a fever. Only the most severely ill would receive treatment, and they would be transferred to medical first because medical professionals did not want to step foot into the isolation ward. And any request for care which deemed non-critical were not just ignored, they were also destroyed so that there would be no trail of inmates requested medical care in isolation and not receiving care.

After 14 days had passed in isolation, all inmates were uniformly deemed clear of COVID.  Inmates still presenting as symptomatic were summarily deemed not transmissible, even though the literature on COVID clearly showed inmates presenting with a fever and other signs of infection could still infect others even after 14 days in isolation. Even though they were not seen or reviewed by any medical professional, they were deemed "medically cleared" and therefore a candidate for further transfer across the DCF. These inmates were often moved soon after clearance into different housing units, and those which were symptomatic would create a new outbreak further perpetuating the super spreader event.

Crist, and all inmates who suffered under these conditions, are entitled to relief.

17

**PARTIES**

4.  Damon Crist is and at all times pertinent has been a citizen of the United States and a resident of the State of Utah.

5.  Defendant is Brian Nelson, in his individual capacity, who is the Executive Director at the Utah Department of Corrections (DOC) and is responsible for providing adequate training and screening procedures for inmates at Draper Correctional Facility (DCF).

6.  Defendant is Tony Washington, in his individual capacity, who was responsible for issuing and implementing medical processes and practices at DCF.

7.  Defendant is Dr. Darrell Olson, in his individual capacity, who was responsible for crafting medical processes and practices at DCF.

8.  Defendant is Dr. Power, in his individual capacity, who was responsible for providing medical care at the DCF.

9.  Defendant is Dr. Nowicki, in his individual capacity, who was responsible for providing medical care at the DCF.

10. Defendant is P.A. Maria Campbell, in her individual capacity, who was responsible for providing medical care at the DCF and medical clearing inmates in isolation.

11. RN Wesley Shuman, in his individual capacity, who was responsible for conducting nasal testing on inmates at the DCF and who performed nasal testing without changing his gloves between tests.

12. Medical Technician Jordan, in his individual capacity, who was responsible for taking Inmate Care Requests (ICRs) and forwarding them onto medical staff for resolution. During the

18

pandemic outbreak, pursuant to policy at the DOC, Jordan would destroy ICRs related to COVID symptoms or medical conditions which were deemed non-serious thereby depriving inmates of medical care.

13. The Department of Corrections (DOC) is a political subdivision of the State of Utah. As part of its corporate powers, and at all times relevant, the Department of Corrections maintained the DCF.

14. Defendants John Does are other medical staff and supervisors at the DCF who were responsible for training, supervising, or managing the COID precautions at the prison, including but not limited to COVID testing, approving inmate transfers, ICR management, medical care available in isolation wards, and medical clearance of inmates.

Defendants (excluding the Department of Corrections) are persons under the meaning of 42 U.S.C. § 1983 and are located in this judicial district.

## BACKGROUND

1. Crist is currently imprisoned at the UCF– a facility which has hosted over 3,000 positive cases of COVID and eighteen deaths.

2. Defendants DOC, Tony Washington, Dr. Olsen, Dr. Power, Dr. Nowicki, P.A. Maria Campbell, RN Wesley Shuman (together "Policy Defendants") are responsible for or played a role in DCF being underequipped, understaffed, and unprepared for the COVID-19 Pandemic. Defendants did not implement the basic safety precautions necessary to prevent the explosion of COVID cases.

3.  Dr. Power, Dr. Nowicki, P.A. Maria Campell, RN Wesley Shuman, and Medical Technician Jordan (together "Medical Defendants") were all personally responsible for some or all of Damon Crist's medical care during the relevant period of time and failed to provide him with care as mandated by the constitution.

*Lack of Protective Equipment for Jail Staff*

4.  Following the introduction of COVID back in early 2020, DCF had the good fortune of avoiding a COVID outbreak at the Prison until September 2020.

5.  Policy Defendants were therefore allowed sufficient time to prepare and plan for the eventual COVID outbreak at the Prison.

6.  Though Policy Defendants created policies and procedures in line with medical recommendations to depress the spread of COVID, they failed to undertake any meaningful actions to actually implement these policies.

7.  In the lead up to the September outbreak, jail staff were routinely seen either without masks or wearing masks incorrectly.

8.  Chain of command made no serious attempts to cure these COVID policy violations.

9.  Indeed, due to the politization of COVID and mask-wearing, the culture within the Prison discouraged the use of masks and downplayed the seriousness of COVID.

10. The Prison experienced a COVID outbreak in September 2020.

11. Following the outbreak, on-the-ground jail staff began taking the COVID threat and masks seriously.

12. Jail staff, however, ran into Policy Defendants' failure to adequately prepare for an outbreak.

13. Policy Defendants do not provide jail staff with new protective masks at the start of the day.

14. Rather, due to a shortage of masks, jail staff were required to wear the same N95 mask for multiple days.

15. Jail staff are instructed to use the same mask for up to 30 days.

16. Jail staff who lose their masks or ask for new masks prior to reissuance are required to report to their chain of command and receive a verbal reprimand.

17.  Crist and fellow inmates have routinely noticed jail staff wearing soiled or damaged N95 masks.

18. CDC recommendations require facemasks to be removed and discarded if soiled, damaged, or hard to breather through.

19. The CDC also considers N95 masks to be a one-time-use product.

20. Policy Defendants have also failed to properly train and/or equip medical staff regarding COVID testing.

21. COVID testing at the Prison is generally conducted via nasal swabs.

22. The nurses and medical technicians who are tasked with testing inmates routinely failed to change gloves between nasal tests.

23. The failure to change gloves between mandated tests exposed inmates to COVID.

21

24. Though inmates have filed grievances regarding both equipment shortages, Policy Defendants failed to provide meaningful relief.

*Mass Movements of Inmates without Testing*

25. Since the first outbreak of COVID at the Prison, Policy Defendants have ordered hundreds of inmate relocations throughout the various housing units.

26. Policy Defendants routinely relocate inmates residing in housing units which have positive cases of COVID to housing units with no COVID cases.

27. Policy Defendants also routinely relocate inmates from isolation, a section devoted to quarantining COVID positive inmates, into housing units with no COVID cases.

28. Though Policy Defendants had access to rapid COVID tests, Policy Defendants transfer inmates without conducting a test on the transferee.

29. P.A. Campell, who was responsible for assessing inmates in isolation for medical clearance, did not do so. Instead, inmates were unilaterally cleared without medical review after 14 days in isolation.

30. By failing to conduct a test on the inmates in isolation prior to transfer, Policy Defendants transferred COVID positive inmates into housing units free of COVID, thereby spreading COVID throughout the facility.

*Comingling of COVID Positive and Negative Inmates*

31. After an inmate tested positive for COVID, the inmate is transferred into a designated housing unit and placed in "isolation".

22

**Formatted:** Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 1 + Alignment: Left + Aligned at: 0.25" + Indent at: 0.5", Don't hyphenate, Don't allow hanging punctuation, Don't adjust space between Latin and Asian text, Font Alignment: Baseline

32. After a positive test was returned, jail staff would alter the relevant housing section that some of the inmates had tested positive.

33. Though housing sections differ between the various buildings in DCF, they are generally the smallest housing subdivision for each building.

34. In the Lonepeak building, for example, each section contained roughly 30 inmates.

35. Despite knowing some inmates were positive, jail staff was allowed by Policy Defendants to delay several hours in transferring a COVID positive inmate into isolation.

36. In the meantime, positive inmates therefore cohabitate with COVID negative inmates for hours at a time.

37. Negative inmates were given no guidance as to how to avoid infection from their positive cohabitants.

38. Moreover, positive inmates are allowed access to common areas, such as recreation and the showers, before a transfer to isolation is made.

39. Inmates were not provided with masks to limit the spread of infection.

40. Positive inmates were not informed of their positive status prior to transfer.

41. The delay in transferring positive inmates exposes negative inmates to the disease.

42. Once in isolation, COVID positive inmates remain as a group until a fourteen-day quarantine has been completed.

43. Once the fourteen-day quarantine has been completed, inmates in isolation are deemed "medically cleared" without any sort of medical review.

44. While the CDC recommends a fourteen day quarantine, it recognizes several factors which may require additional isolation, including severity of the illness, whether the individual is immunocompromised, and whether the individual is still symptomatic.

45. Medical staff, however, do not review each inmate in isolation prior to adjudicating them "medically cleared" after fourteen days.

46. Inmates who are symptomatic (and therefore contagious) are then moved throughout the prison into housing units without a COVID case.

47. These symptomatic inmates are placed in cells along with COVID negative inmates, thereby transferring the contagion.

48. Policy Defendants failure to require medical review for inmates in isolation coupled with the subsequent transfer of said inmates exposed COVID negative inmates to the disease.

*Inadequate Access to Medical Case*

49. Medical staff is conspicuously absent in isolation units.

50. If an inmate is suffering from an emergent medical issue, the inmate will be removed from isolation and placed into medical.

51. For inmates held in isolation not suffering from an emergency, they are seen on two occasions daily by medical technicians.

52. The medical technicians have been ordered by Policy or Medical Defendants to ignore medical requests related to COVID unless the request pertains to an emergency.

53. Non-emergency medical requests are ignored and, if related to COVID, are not even put into the medical records.

24

54. Inmates suffering from COVID are only provided access to Tylenol.

55. Due to the extraordinary burden on medical resources caused by COVID, inmates suffering from medical conditions outside of isolation are also having their medical requests ignored unless they are deemed an emergency.

56. Medical needs are being ignored wholesale throughout the Prison.

57. Medical Defendants are denying inmates access to medical care unless they are suffering from emergent health threats.

*Damon Crist's Experience with COVID*

58. Prior to the outbreak of COVID, Crist was stationed at the Lonepeak building at the DCF.

59. The Lonepeak building, which has the capacity to hold three hundred inmates, was only occupied by about 40 inmates prior to October 2020.

60. At the tail end of September 2020, the DCF had its first COVID outbreak in the Wasatch building.

61. Inmates who tested positive for COVID were kept in isolation in the Wasatch building.

62. After 14 days, all positive inmates were unilaterally declared "medically cleared" even though they were not screened for symptoms or tested for detectable COVID.

63.  Inmates who had previously been housed in Wasatch were then transferred across the various buildings at DCF, including the Lonepeak building.

64. Though multiple sections lay vacant and available, Policy Defendants reviewed and approved the transfer of Wasatch isolation inmates into the same housing sections occupied by Crist and other Lonepeak inmates.

25

65. Prior to the transfer, there had been no COVID outbreak at the Lonepeak building.

66. Several inmates transferred to Lonepeak from Wasatch appeared with COVID symptoms.

67. In the days following transfer, Lonepeak inmates began testing positive for COVID.

68. Testing would usually be done in the morning with results in by the afternoon.

69. RN Wesley Shuman administered nasal swab testing to Lonepeak inmates without changing gloves or sanitizing the porthole where inmates stuck their face in order to provide a sample. Despite Crist's protests, Shuman did not change his gloves.

70. Jail staff would report to all Lonepeak inmates that some had tested positive for COVID but would then wait until the evening before transferring positive inmates to isolation.

71. When asked about the delay, jail staff responded day staff did the testing so night staff does the transfers.

72. This practice caused negative inmates to reside, unmasked, for several hours with confirmed positive cases.

73. COVID continued to spread throughout Lonepeak.

74. Crist tested positive for COVID on November 6th, 2020, and like before he was allowed to reside with negative inmates for several hours until he was finally transferred into isolation.

75. Upon transfer to isolation, Crist was greeted by jail staff with "welcome to hell".

76. COVID positive inmates presented at various stages of the disease – some were asymptomatic but many were suffering.

77. In isolation, Crist occasionally had access to Tylenol but was often told DCF had run out.

78. Medical Defendants, who were obligated to provided care to Crist and the inmates in isolation, never assessed Crist or monitored his status.

79. Instead, inmates were given a thermometer so that they can monitor each other's temperatures.

80. No medical staff were present in isolation. Instead, medical technicians visited twice a day, in full hazmat suits, to administer "pill line".

81. At pill line, inmates are provided chronic medications and have an opportunity to request medical care by submitting Inmate Care Requests (ICRs).

82. Medical technicians are required to upload the text of the ICR into the medical system and then destroy the written request.

83. Crist began experiencing the symptoms of COVID, including a heavy pressure on his chest and lightheadedness that made it difficult to stand without support.

84. Crist submitted at least three ICRs to various medical technicians during his stint in isolation – he did not receive a response to his ICRs.

85. Medical Technician Jordan received at least one of his ICRs which contained a demand for COVID care but also prescription refill request.

86. Jordan uploaded the part of the ICR with the prescription refill but did not upload the request for COVID care.

87. In fact, none of the other two ICRs which contained requests for medical attention related to his COVID symptoms were ever uploaded – they were simply destroyed.

27

88. When confronted with the destroyed ICRs, Jordan indicated DCF did not have the ability to attend to all medical requests – only the most serious. Another officer then remotely closed the door in Crist's face and Jordan left isolation.

89. ICRs related to COVID care were routinely destroyed either as a matter of practice/policy or on the orders of Medical Defendants.

90. Medical Defendants did not provide care to inmates in isolation except for those in critical condition.

91. On November 20th, 2020, fourteen days to the date he tested positive, Crist was deemed "cleared" from COVID.

92. DOC staff walked the hall of the isolation ward and declared everyone was cleared from COVID because fourteen days had passed.

93. Though Crist's medical records indicate he was released from medical isolation by PA Campbell, he was never seen by Campbell on November 20, 2020.

94. Indeed, no one ever checked his vitals or asked about his symptoms prior to being medically cleared.

95. All inmates in the isolation ward were cleared even though several had obvious symptoms of COVID.

96. One of his co-inmates was suffering from a fever of 103 degrees yet he was also cleared from isolation.

97. These inmates were then transferred out of isolation amongst COIVD negative inmates, thus perpetuating the spread of COVID.

98. Crist did not have his COVID symptoms addressed until long after his stay in isolation and continued to suffer from long term symptoms months after his initial contraction.

99. DCF is now suffering from a second explosion of COVID and continues to use many of the same policies and procedures which caused the original super spreader event and deprived inmates of access to medical care.

**FIFTH CAUSE OF ACTION**

Unconstitutional Policy and Practice putting Inmates at Risk for COVID and depriving them of Medical Care against Policy Defendants (excluding DOC) and John Does
(Cognizable under 42 U.S.C. §1983)
*Individually and on behalf of a Class*

117. Plaintiff adopts by reference all preceding paragraphs.

118. "After incarceration," the Eight Amendment prohibits "the unnecessary and wanton infliction of pain" on prisoners. *Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986).

119. The government further has "an obligation to provide medical care from those whom it is punishing by incarceration". *Estelle v. Gamble,* 429 U.S. 97, 103, 97 S. Ct. 285, 290, 50 L. Ed. 2d 251 (1976).

120. Policy Defendants implemented policies and practices whereby inmates were recklessly put at risk for COVID, including through the denial or misuse of PPE, testing inmates without basic safety precautions, allowing positive inmates to comingle with negative inmates for hours at a time, clearing inmates of COVID following 14 days without any screening as to

29

whether the inmates may still be contagious, and the needless transferring of inmates out of isolation to different buildings at the DCF.

121. Policy Defendants implemented policies and practices whereby inmates were roundly denied access to medical care while stationed in isolation, including understaffing medical personnel, destroying ICRs, and rationing health care.

122. These policies and practices were the moving force behind Crist and other inmates contracting COVID.

123. These policies and practices were the moving force behind Crist and other inmates' needless suffering during isolation.

124. Policy Defendants were all responsible for creating and implementing COVID practices and protocols at the DCF.

## SIXTH CAUSE OF ACTION

Deprivation of Medical Care against Medical Defendants and John Does
(Cognizable under 42 U.S.C. §1983)
*Individually and on behalf of a Class*

125. Plaintiff adopts by reference all preceding paragraphs.

126. Crist and other inmates placed into isolation were under the Medical Defendants' hierarchy of care.

127. In other words, Medical Defendants were responsible for providing inmates medical care while they resided in isolation.

128. Medical Defendants deprived Crist and similar situated inmates of medical care by roundly destroying ICRs related to COVID, ignoring isolated inmates' medical requests, and refusing to medically screen inmates following their fourteen-day quarantine in isolation.

129. Medical Defendants' acts and omissions were the moving force behind Crist and other inmates' inability to be seen by medical and needless suffering during isolation.

**SEVENTH CAUSE OF ACTION**
Undue Rigor against COVID Defendants (including DOC) and John Ddoes
(Cognizable under Article I, Section 9 of the Utah Constitution)
*Individually and on behalf of a Class*

130. Plaintiff adopts by reference all preceding paragraphs.

131. The Department of Corrections is responsible for the constitutional violations committed by its officers under DOC policy.

132. COVID Defendants' acts and omissions as set forth above deprived Mr. Crist of his constitutional rights guaranteed by Article I, Section 9 of the Utah Constitution, which provides that imprisoned persons shall not be subjected to or treated with unnecessary rigor.

133. COVID Defendants violations of Mr. Crist's rights secured under Article I, Section 9 proximately caused Mr. Crist to suffer damages, including but not limited to an increased risk for COVID and the denial of access to medical care.

134. COVID Defendants were put on notice regarding deficient practices and policies through grievances filed by Crist and fellow inmates.

135. Despite being on notice, Defendants took no steps to limit inmate exposure or increase access to medical care.

31

136. Medical Defendants further personally deprived Crist and inmates of access to medical
care, precluding any amelioration of symptoms or complications related to COVID.

137. Crist and fellow inmates suffered harm due to Defendants' acts and omissions.

**EIGHTH CAUSE OF ACTION**
**Negligence**
against COVID Defendants (including DOC) and John Does
*Individually and on behalf of a Class*

138. Plaintiff adopts by reference all preceding paragraphs.

139. The Department of Corrections is responsible for the conduct committed by its staff.

140. COVID Defendants had a duty of care to Plaintiff.

141. That duty of care required limiting inmate exposure to COVID and allowing Crist and
inmates access to adequate medical care.

142. Defendants violated their duty of care by failing to follow safety standards, including but
not limited to improperly administering COVID testing and comingling COVID positive
inmates with COVID negative inmates.

143. Defendants violated their duty of care by denying access to medical care, including but not
limited to destroying ICRs, ignoring ICRs, avoiding the isolation ward, and failing to
medically screen inmates after 14 days quarantined in isolation.

144. By breaching their duty, Defendants caused Crist and similarly situated inmates harm and
put them at risk for negative health outcomes.

**NINTH CAUSE OF ACTION**
**Medical Malpractice**
against COVID Defendants (including DOC) and John Does
*Individually and on behalf of a Class*

32

145. Plaintiff adopts by reference all preceding paragraphs.

146. The Department of Corrections is responsible for the conduct committed by its staff.

147. COVID Defendants had a duty of care to Plaintiff.

148. That duty of care required limiting inmate exposure to COVID and allowing Crist and inmates access to adequate medical care.

149. Defendants violated their duty of care by failing to follow safety standards, including but not limited to improperly administering COVID testing and comingling COVID positive inmates with COVID negative inmates.

150. Defendants violated their duty of care by denying access to medical care, including but not limited to destroying ICRs, ignoring ICRs, avoiding the isolation ward, and failing to medically screen inmates after 14 days quarantined in isolation.

151. By breaching their duty, Defendants have caused Crist and similarly situated inmates harm and put them at risk for negative health outcomes.

## CLASS ALLEGATIONS - COVID

152. Plaintiff brings his claims on behalf of a class and subclass pursuant to Rule of Civil Procedure 23(a) and 23(b)(3).

153. The Class consists of (a) all detainees residing at the DCF (b) who contracted COVID 19 (c) between October 2020 and June 2021.

154. On information and belief, the class is so numerous that joinder of all members in not practicable. The information relating to the precise number of persons who fall within the respective classes is within the control of the Defendant.

155. There are questions of law and fact common to the members of each class, which common questions predominate over any questions relating to individual class members. The predominant common questions are (a) whether Defendants have propagated a policy or practice recklessly endangering inmates for COVID's contraction; (b) whether inmates were denied access to medical personnel during isolation; (c) whether these practices caused inmates harm; (d) whether such practices violate detainee's state and federal constitutional rights; and (e) whether such practices constitute medical malpractice or negligence.

156. Plaintiff's claims are typical of the claims of the respective class members. All are based on the same factual and legal theories.

157. Plaintiff will fairly and adequately represent the members of each class. Plaintiffs has retained counsel experienced in class actions and civil rights litigation.

158. A declaration of law and injunctive relief is appropriate for the members of the Class.

159. A class action is superior for the fair and efficient adjudication of the claims of the Classes, in that:

    d.   Individual actions are not economically feasible;

    e.   Members of the class are likely to be unaware of their rights;

    f.   Congress intended class actions to be an enforcement mechanism for constitutional violations.

## PRAYER FOR RELIEF – COVID CASE

WHEREFORE, Plaintiff requests this court enter judgment against COVID Defendants, and each of them and provide the following relief:

    h.   Certify the Class and appoint Plaintiff as the class representative and his counsel as class counsel;

    i.   Compensatory and special damages in whatever amount, exclusive of costs and interest, that Plaintiff/the Class is found to be entitled;

    j.   Punitive/exemplary damages against Defendants in whatever amount, exclusive of costs and interest, that Plaintiff/the Class is found to be entitled;

    k.   For interest and costs as allowed by law;

    l.   For attorney fees, pursuant to 42 U.S.C. § 1988; and

    m.  Such other and further relief as the court deems appropriate.

Dated this 23rd day of June, 2020.

/s/     Daniel Baczynski
Attorney for Plaintiff